UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Yongdi Chen,

          Petitioner,

v.

Scott Banieke, Field Office Director of ICE;
Jeh Johnson, Secretary of DHS; Sarah Saldana,
Director of ICE; and Mike Stasko, Administrator
of the Freeborn County Adult Detention Center,

          Respondents.

Civ. No. 15-2188 (DSD/BRT)

**REPORT AND RECOMMENDATION**

Anne E. Carlson, Esq., and David L. Wilson, Esq., Wilson Law Group, counsel for Petitioner.

Ana H. Voss, Esq., and D. Gerald Wilhelm, Esq., United States Attorney's Office, counsel for Respondents.

BECKY R. THORSON, United States Magistrate Judge.

Yong Di Chen,[1] a Chinese national presently confined at the Freeborn County Adult Detention Center in Albert Lea, Minnesota, has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2241, challenging his ongoing administrative detention by Immigration and Customs Enforcement ("ICE"). (Doc. No. 1, Pet.) Chen contends that his continued detention is unlawful under *Zadvydas v. Davis*, 533 U.S. 678 (2001),

---

[1] Although the docket lists the petitioner's name as Yongdi Chen, virtually every document related to his immigration status and proceedings, including his order of removal, indicate that his name is actually Yong Di Chen. (*See generally* Doc. No. 12, Attach. 1.)

because ICE has not, during the nine months since his final order of removal was issued, been able to obtain a travel document for his repatriation to China or provide a concrete indication of when it expects to do so. (*See id.* ¶¶ 20–22; Doc. No. 15, Pet'r's Mem. 3–4.) He therefore requests immediate release from custody under an order of supervision. (Pet. ¶¶ 25, 32.) Because Chen has not demonstrated that there is no significant likelihood of removal in the reasonably foreseeable future, this Court recommends that his petition be denied without prejudice.

## I. BACKGROUND

Chen, a native and citizen of China, illegally crossed the United States-Mexico border on March 27, 2014, without inspection by an immigration official or a valid entry document. (*See* Doc. No. 12, Attach. 1 at 2, 6–8, 10, 54.) He was apprehended by border patrol agents approximately one week later, on April 4, 2014, and later charged with removability under 8 U.S.C. § 1182(a)(7)(A)(i)(I) for being inadmissible at the time of entry due to the lack of a valid visa, border crossing card, or other valid entry document. (*See id.* at 2–4, 6–7, 48.) Chen initially applied for asylum and withholding of removal based on a claim of religious persecution in China, though he subsequently withdrew those applications for relief. (*See id.* at 11–12, 15, 17–19, 43.) On September 22, 2014, an immigration judge ("IJ") ordered Chen's removal to China and Chen waived his right to appeal, making the IJ's decision the final administrative order of removal. (*See id.* at 43, 47–48); *see also* 8 C.F.R. §§ 1003.39, 1241.1(b).

In early October 2014, less than a month after he was ordered removed, ICE requested a travel document from the Chinese consulate in Beijing in order to facilitate

Chen's departure. (*See* Doc. No. 12, Attach. 1 at 50, 54.) On November 25, 2014, ICE's attaché in Beijing indicated that the Chinese government should issue the necessary travel document within forty-five days (*i.e.*, by January 9, 2015). (*Id.*) In the meantime, ICE conducted a required ninety-day review of Chen's custody status in December 2014 and concluded that further detention was warranted because Chen appeared to be "a flight risk due to his pending removal and his lack of family ties in the local community,"[2] and because his removal was "likely in the reasonabl[y] foreseeable future." (*Id.* at 54); *see* 8 C.F.R. § 241.4(k) (requiring a custody review before expiration of the general ninety-day removal period). Chen was notified of the decision to continue his detention by letter dated December 17, 2014, which explained that he appeared to be a flight risk and that his removal was expected to occur in the foreseeable future given ICE's efforts "towards obtaining a document for [his] removal to China." (Doc. No. 12, Attach. 1 at 56.)

The Chinese government did not issue the requested travel document within the anticipated forty-five-day window and, on March 25, 2015, ICE reviewed Chen's custody status for a second time. (*See id.* at 58.) ICE again decided to continue Chen's detention because "[a] request for a travel document was submitted on [his] behalf to the government of China" and, thus, his removal was "expected to occur in the reasonably foreseeable future." (*Id.*) Two days later, on March 27, 2015, the respective directors of ICE and China's Ministry of Public Safety ("MPS") signed a repatriation memorandum

---

[2]   It appears that immigration officials were concerned that, if released, Chen would flee to his aunt's home in Massachusetts, possibly to work at her restaurant in an effort to pay off the remaining $40,000 debt that he owed to those who smuggled him into the United States. (*See* Doc. No. 12, Attach. 1 at 41, 51.)

of understanding ("MOU"), which altered the process used by the Chinese government for verifying the nationality of those seeking travel documents. (Doc. No. 13, Decl. of Samuel Hartfield ("Hartfield Decl.") ¶¶ 4–5.) Prior to the MOU, the Chinese government performed the required verification process in Beijing—rather than through the Chinese embassy in the United States—an apparently lengthy process that delayed the issuance of travel documents by an average of 160 to 180 days. (*Id.* ¶ 4.) The MOU modified that process by allowing initial verification of Chinese nationality through interviews conducted by Chinese experts in the United States. (*Id.* ¶ 5.)

After the MOU was signed, ICE representatives met with Chinese delegates to discuss various repatriation issues, including securing interview dates for suspected Chinese nationals who had been ordered removed from this country. (*See id.* ¶ 6; Doc. No. 12, Attach. 1 at 60.) Chinese officials presented a list of forty-two such persons, including Chen, whose nationality had been verified without the need for an interview, and notified ICE that it had to resubmit several of its earlier requests for travel documents. (*See* Hartfield Decl. ¶ 6; Doc. No. 12, Attach. 1 at 60.) On May 5, 2015, a little over two months ago, ICE resubmitted its request to the Chinese government for a travel document for Chen. (Doc. No. 12, Attach. 1 at 60.) ICE's request pleaded for a "prompt response" as Chen was "being detained at ICE expense" and would "be scheduled to depart the United States upon receipt of a travel document." (*Id.*) There is no indication in the record that China has responded to that renewed request for a travel document.

One week before ICE renewed its travel document request, and approximately seven months after his final order of removal, Chen filed his § 2241 petition claiming that his continued detention is unreasonable under *Zadvydas* because ICE had yet to obtain a travel document for his removal or set an impending departure date. (Pet. 3–4.) The government responded on May 29, 2015, arguing that Chen has not met his initial burden of showing that there is no significant likelihood of removal in the reasonably foreseeable future and, in any event, that his removal was likely to occur within the next sixty days as the issuance of a travel document appeared "imminent." (Doc. No. 11, Resp. 1, 4–11.) In support, the government submitted a declaration from Detention and Deportation Officer Samuel Hartfield, assigned to the Travel Document Unit of ICE's Enforcement and Removal division, who averred that U.S. and Chinese officials signed the MOU on March 27, 2015, that the "Chinese government readily issues travel documents to aliens whose identity has been verified by [its] Ministry of Public Safety," and that Chen was one of the forty-two individuals whose nationality had been verified by Chinese officials in accordance with the MOU (albeit without an interview). (Hartfield Decl. ¶¶ 4–6.) In light of those developments, Hartfield believed as of May 21, 2015, "that the issuance of a travel document for [Chen was] imminent" and, because there were no "further impediments to removal," removal was "significantly likely to occur in the reasonably foreseeable future." (*Id.* ¶ 7.)

Since that time, Chen's custody was reviewed for a third time on June 22, 2015, and ICE again decided to continue his detention because a travel document request was still pending and had not been denied by the Chinese government. (Doc. No. 18, Attach.

1 at 1–2.) Despite Hartfield's asserted belief that the issuance of a travel document was imminent, ICE has yet to obtain such a document and the government now indicates that it "cannot provide a definite timetable for [Chen's] removal or the issuance of the travel document from China." (Doc. No. 17, Supplemental Resp. 2.) The government nevertheless argues that Chen has not carried his burden of demonstrating no significant likelihood of removal in the reasonably foreseeable future because "China typically issues travel documents readily to immigrants such as [Chen] whose nationality has been verified." (*Id.* at 2–3.)

## II. ANALYSIS

By statute, the government is required to detain an alien during a ninety-day removal period, which in this case began roughly nine months ago when Chen's order of removal became final on September 22, 2014. *See* 8 U.S.C. § 1231(a)(1)–(2). Where, as here, the government is unable to secure removal within that ninety-day period, it may continue to detain certain classes of removable aliens, including those like Chen who are inadmissible under § 1182 or otherwise deemed to be a flight risk by the Attorney General. *Id.* § 1231(a)(6); *see also Clark v. Martinez*, 543 U.S. 371, 377 (2005). Because the language of § 1231(a)(6) can be read to authorize "indefinite and potentially permanent detention," thus raising serious due process concerns, the Supreme Court in *Zadvydas* construed that provision to implicitly limit "an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States." 533 U.S. at 689–90, 696. The Court reasoned that where removal is "no longer practically attainable" and "seems a remote possibility at best," such that an

alien's detention is "potentially indefinite" and "potentially permanent," detention "no longer bears a reasonable relation to the purpose for which the [alien] was committed" — namely, to ensure "the alien's presence at the moment of removal." *Id.* at 690–91, 695, 699 (quotation and alterations omitted). The Court therefore held that "once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." *Id.* at 699.

To aid lower courts in making that determination, the Court further held that it is presumptively reasonable for the government to detain an alien for six months after the statutory removal period has begun. *Id.* at 701. After that six-month period has expired, as it did in this case on March 22, 2015, an alien may seek his conditional release by providing "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," which then requires the government to "respond with evidence sufficient to rebut that showing." *Id.* As the period of post-removal-order detention grows, "what counts as the 'reasonably foreseeable future' conversely would have to shrink." *Id.* An alien may, however, continue to "be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.*

This Court concludes that Chen has not carried his initial burden under *Zadvydas* of demonstrating that there is no significant likelihood of removal in the reasonably foreseeable future. *See id.*; *see also Martinez*, 543 U.S. at 378 (explaining that, after expiration of the presumptively reasonable six-month period, an alien is "eligible for conditional release if he can demonstrate that there is no significant likelihood of removal

7

in the reasonably foreseeable future") (quotation omitted); *Andrade v. Gonzales*, 459 F.3d 538, 543 (5th Cir. 2006) ("The alien bears the initial burden of proof in showing that no such likelihood of removal exists."). In an attempt to make that showing, Chen relies on the fact that ICE has not, within the nine months of his post-removal-order detention, been able to secure a travel document from the Chinese government or "provide a substantive indication regarding when it expects to obtain one." (Doc. No. 15 at 3–4.)

For there to be no significant likelihood of removal in the reasonably foreseeable future, there must be some indication that the government is either unwilling to remove an alien or incapable of doing so due to seemingly insurmountable barriers, such as an alien's stateless status, a foreign country's outright refusal to issue travel documents, the absence of an extant or expected repatriation agreement between the countries in question, or political conditions in the alien's native country that render removal a near impossibility.[3] The mere passage of time, including concomitant delays in obtaining travel documents, is not alone sufficient to show that no such likelihood exists unless the

---

3     *See, e.g.*, *Zadvydas*, 533 U.S. at 684–85, 702 (involving a stateless alien and one whose native country had no repatriation agreement with the United States, though still noting that the absence of an "extant or pending" repatriation agreement is not determinative unless there is no "likelihood of successful future negotiations"); *Akinwale v. Ashcroft*, 287 F.3d 1050, 1052 (11th Cir. 2002) (affirming the dismissal of an alien's petition where there were no "facts indicating that the INS is incapable of executing his removal to Nigeria and that his detention will, therefore, be of an indefinite nature"); *Jama v. ICE*, No. 01-1172, 2005 WL 1205160, at *4 (D. Minn. May 20, 2005) (ordering a detainee's release where ICE acknowledged that deportation "may well be impossible" given the then-existing political conditions in Somalia); *Nma v. Ridge*, 286 F. Supp. 2d 469, 475 (E.D. Pa. 2003) (explaining that an alien can show no significant likelihood of removal where, among other things, "*no* country will accept [him]," where his "country of origin refuses to issue a travel document," or where "there is no removal agreement between [his] country of origin and the U.S.").

delays are so extraordinarily long as to trigger an inference that travel documents will likely never issue at all.[4]

This Court believes that these precepts appropriately reflect the concerns that animated the Supreme Court's decision in *Zadvydas*, the principles that it adopted to address them, and the practical fact that the "reasonableness of detentions pending deportation cannot be divorced from the reality of the bureaucratic delays that almost always attend such removals." *Fahim*, 227 F. Supp. 2d at 1367. The Court's decision in *Zadvydas*, after all, was primarily concerned with situations where "removal seems a remote possibility at best," is "no longer practically attainable," and "has no obvious termination point" because the "Government finds itself unable to remove" an alien, not where removal is temporarily impeded by bureaucratic delays, setbacks, and ongoing

---

[4] *See, e.g.*, *Joseph v. United States*, 127 F. App'x 79, 81–82 (3d Cir. 2005) (unpublished) (holding that a lengthy delay in the issuance of travel documents was not alone sufficient to show no substantial likelihood of removal, but noting that "at some point in time the inability to procure travel documents may provide good reason to believe that removal is unlikely to be carried out" where it suggests more than "a case of bureaucratic inertia and [that] the documents will be issued in due course") (quotation omitted); *Jaiteh v. Gonzales*, No. 07-1727, 2008 WL 2097592, at *3 (D. Minn. Apr. 28, 2008) (explaining that "where a foreign country ordinarily accepts repatriation, and that country is acting on an application for travel documents," an alien fails to show no significant likelihood of removal unless the country "delays issuance of travel documents for an extraordinarily long period," such that "it is possible to infer . . . that documents will not issue at all"); *Fahim v. Ashcroft*, 227 F. Supp. 2d 1359,1366–67 (N.D. Ga. 2002) (holding that mere delays and the passage of time are not sufficient because they do not mean that a foreign country will not "ultimately comply" with a request for travel documents and, thus, "that a deportable alien will never be accepted by his native country"); *Lema v. U.S. I.N.S.*, 214 F. Supp. 2d 1116, 1118 (W.D. Wash. 2002) (explaining that "the continuing failure of a destination country to respond to a request for travel documents may provide the Court with good reason to believe that deportation is not likely in the reasonably foreseeable future" where it reflects "more than bureaucratic inertia" and a "slow process").

negotiations with foreign governments. *See* 533 U.S. at 690, 695, 697; *see also id.* at 695 ("[T]he issue we address is whether aliens that the Government finds itself unable to remove are to be condemned to an indefinite term of imprisonment within the United States."). And rather than setting forth a definitive deadline or concrete timetable for removals, the Court adopted a more malleable standard focused on the likelihood and foreseeability of removal, one that accounted for "the greater immigration-related expertise of the Executive Branch" and afforded it "appropriate leeway when its judgments rest upon foreign policy expertise," including "the status of repatriation negotiations." *Id.* at 700–01; *see also id.* at 699 ("[O]nce removal is no longer *reasonably foreseeable*, continued detention is no longer authorized by statute.") (emphasis added); *id.* at 702 (focusing on how "unlikely or unforeseeable" removal is). While the Court did explain that "what counts as the 'reasonably foreseeable future'" necessarily shrinks "as the period of prior postremoval confinement grows," it underscored that "an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* at 701. Delays in securing an alien's removal do not alone indicate that removal is a "remote possibility at best" and "no longer practically attainable" unless they are so lengthy as to raise the specter that the government is simply "unable to remove" the alien because travel documents will likely never issue.

Chen has not pointed to anything that shows that the government is either unwilling or, due to seemingly insurmountable obstacles, unable to secure his removal in the reasonably foreseeable future, and the record suggests otherwise. The record indicates

that ICE has undertaken reasonable efforts to secure Chen's removal, including requesting a travel document from the Chinese government within a month of his ordered removal and, when that document did not issue within the anticipated timeframe, meeting with Chinese delegates to resolve repatriation issues, signing an updated repatriation memorandum of understanding, resubmitting its request for travel documents in accordance with China's demands, and pleading for a "prompt response" to that renewed request so Chen could "be scheduled to depart the United States." (*See* Doc. No. 12, Attach. 1 at 50, 54, 60; Hartfield Decl. ¶¶ 5–6.) The record further indicates that China ordinarily issues travel documents to aliens like Chen whose Chinese nationality has been verified.[5] (*See* Hartfield Decl. ¶¶ 4, 6); *see also Jaiteh*, 2008 WL 2097592, at *3 ("[W]here a foreign country ordinarily accepts repatriation, and that country is acting on an application for travel documents, most courts conclude the alien fails to show no significant likelihood of removal.") (collecting cases).

---

[5] Chen asks this Court to discount Hartfield's averments regarding the MOU and the list of verified Chinese nationals because the government has not submitted a copy of either document or otherwise shown that the Yong Di Chen that evidently appears on that list is the petitioner, rather than another "Yongdi Chen in removal proceedings." (*See* Doc. No. 15 at 5.) Hartfield's statements, subscribed as true under penalty of perjury, regarding the MOU and that "Yong Di Chen is one of the individuals whose nationality has been verified" are sufficient by themselves to establish those facts, particularly given the absence of any indication that Hartfield is lying or mistaken. (*See* Hartfield Decl. 2–3.) Chen's unsupported and speculative assertion that "[i]t is unlikely that there is only one Yongdi Chen in removal proceedings" (Doc. No. 15 at 5) is not enough to cast doubt on Hartfield's sworn statement that the petitioner himself is one of the forty-two individuals included on the list of verified Chinese nationals. *Cf. Sargent v. Armontrout*, 841 F.2d 220, 226 (8th Cir. 1988) ("When seeking habeas relief, the burden is on the petitioner to prove that his rights have been violated. Speculation and conjecture will not satisfy this burden.").

That Chen has now been detained for over nine months, that approximately two months have passed since ICE resubmitted its request for travel documents, and that the Chinese government has yet to respond to that renewed request do not alone show that travel documents will not issue in the foreseeable future, such that Chen's detention may be indefinite because "removal seems a remote possibility at best" and "no longer practically attainable."[6] While nine months of post-removal-order detention is certainly a considerable length of time, "[p]rogress, however slow, is being made on [Chen's] individual case" and the delays thus far encountered by ICE in securing a travel document for his removal "simply show[] that the bureaucratic gears . . . are slowly grinding away." *See Khan*, 194 F. Supp. 2d at 1137.[7]

---

[6] *See, e.g.*, *Joseph*, 127 F. App'x at 81–82 (alien detained for more than two years not entitled to release where travel documents had been requested and Antigua had provided such documents in the past); *Faustov v. Napolitano*, No. 1:13-cv-1018, 2013 WL 3474766, at *5 (M.D. Pa. July 10, 2013) (citing numerous cases in which post-removal detention periods of ten to eighteen months have been upheld as reasonable under *Zadvydas*); *Nabil v. Holder*, No. JFM-10-1786, 2010 WL 4485894, at *3 (D. Md. Nov. 9, 2010) (alien held for more than a year not entitled to release where "ICE has been able to remove Afghani nationals to Afghanistan" and "travel documents to Afghanistan are obtainable," though "it sometimes takes awhile to obtain the travel documents"); *Jaiteh*, 2008 WL 2097592, at *2–3 (fourteen-month delay in the issuance of travel documents not sufficient to warrant release under *Zadvydas*); *Head v. Keisler*, No. CIV-07-402-F, 2007 WL 4208709, at *1, 4 (W.D. Okla. Nov. 26, 2007) (alien held for thirteen months not entitled to release where Brazil ordinarily accepted repatriation and had not rejected ICE's attempts to obtain travel documents); *Khan v. Fasano*, 194 F. Supp. 2d 1134, 1135–37 (S.D. Cal. 2001) (alien held for eleven months not entitled to release where Pakistan ordinarily accepted repatriation, the INS had requested travel documents, and a meeting had been scheduled between INS officials and the Pakistani Consulate to discuss the petitioner's repatriation).

[7] In seeking his immediate release from detention, Chen relies on *Bah v. Cangemi*, 489 F. Supp. 2d 905, 923 (D. Minn. 2007), which found that a Liberian national had

(Footnote Continued on Next Page)

Furthermore, the fact that ICE has not been able to provide a definite indication as to when it expects to obtain a travel document from the Chinese government is not, in this Court's view, sufficient to satisfy Chen's burden at this time. The U.S. government cannot reasonably be expected to give such a specific indication when the power to issue a travel document, and the timing of its issuance, ultimately rests with a foreign government. In addition, the fundamental question under *Zadvydas* is whether "there is no significant likelihood of removal in the reasonably foreseeable future," not whether the government has established a concrete timeframe for securing necessary travel documents, and the initial burden of making that showing squarely rests with the petitioner, not on the government. *See* 533 U.S. at 701; *Fahim*, 227 F. Supp. 2d at 1366 (rejecting a petitioner's attempt "to place the burden on the Government to show when it will remove petitioner" because "the Supreme Court held that it is petitioner's burden first to show good reason to believe that there is no significant likelihood of removal"). While the government might need to provide a concrete timeframe where circumstances suggest that removal is no longer practically attainable, such as where no visible progress has been made over a lengthy period of time, this is not one of those cases. *See Singh v.*

---

(Footnote Continued from Previous Page)
satisfied his initial *Zadvydas* burden where he had been detained pending removal for fourteen months and the government was growing "less positive" that removal would occur, telling the petitioner only that there was "no indication . . . that Liberia would not issue travel documents." (*See* Doc. No. 15 at 3–4.) But *Bah* is distinguishable from this case, both in terms of the length of post-removal-order detention and the likelihood of removal going forward. In this case, ICE has made significant strides towards effectuating Chen's eventual removal, including negotiating a streamlined process for verifying the nationality of suspected Chinese citizens subject to removal and having Chen included on a list of verified Chinese nationals.

*Gonzales*, 448 F. Supp. 2d 1214, 1220 (W.D. Wash. 2006) (granting release where the petitioner had been detained for more than three years and the government could not provide any "substantive indication regarding how or when it expects to obtain the necessary travel documents").

Because Chen has not established, at this time and in light of the current record, that there is no significant likelihood that he will be removed to China in the reasonably foreseeable future, he is not entitled to immediate release from detention under *Zadvydas*. Nevertheless, as circumstances may change, and because "what counts as the 'reasonably foreseeable future'" necessarily shrinks "as the period of prior postremoval confinement grows," this Court recommends that his petition be denied without prejudice. *See Mehighlovesky v. U.S. Dep't of Homeland Sec.*, No. 12-902, 2012 WL 6878901, at *6 (D. Minn. Dec. 7, 2012) (recommending dismissal without prejudice); *Jaiteh*, 2008 WL 2097592, at *3 (same). If the government continues to detain Chen without making further progress towards his removal, or if circumstances otherwise begin to suggest that removal is no longer practically attainable in the foreseeable future, Chen may renew his *Zadvydas* claim at that time by filing a new petition for a writ of habeas corpus.[8]

---

[8] It would, of course, behoove the government to redouble its efforts to carry out Chen's removal before time and circumstance suggest that removal is no longer reasonably foreseeable.

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Yong Di Chen's petition for a writ of habeas corpus (Doc. No. 1) be **DENIED WITHOUT PREJUDICE**.

Date: July 14, 2015

*s/ Becky R. Thorson*
BECKY R. THORSON
United States Magistrate Judge

## NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), a party may file and serve specific written objections to this Report and Recommendation by **July 28, 2015**. A party may respond to those objections within **fourteen days** after service thereof. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).